UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| THE BLACKJEWEL LIQUIDATION TRUST, *by and through* DAVID J. BECKMAN, TRUSTEE, | ) ) ) ) | |
| | ) | No. 6:26-CV-11-REW-EBA |
| Plaintiff, | ) ) | |
| v. | ) ) | OPINION & ORDER |
| JAVELIN GLOBAL COMMODITIES (US), LP, *et al.*, | ) ) ) ) | |
| Defendants. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Before the Court is Defendant Javelin Global Commodities (US) LP ("Javelin") and Black Mountain Marketing and Sales LP's ("Black Mountain" or "BMMS") (collectively, "Defendants") motion for summary judgment. *See* DE 50 (Motion); DE 50-1 (Memorandum in Support). Plaintiff The Blackjewel Liquidation Trust, by and through Trustee David J. Beckman (the "Trust" or "Blackjewel"), responded in opposition, *see* DE 56, and Defendants replied, *see* DE 60. For the following reasons, the Court **DENIES** DE 50.

## I.     Background

On July 1, 2019, Blackjewel LLC and its affiliated debtors (collectively, "the Blackjewel Debtors") initiated Chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of West Virginia.[1]  *See* DE 56 at 2; *In re Blackjewel LLC*, No. 3:19-BK-30289 (Bankr. S.D. W. Va. July 1, 2019), DE 1 therein.  The Blackjewel Debtors held a bankruptcy

---

[1] Plaintiff Blackjewel is a successor to the Blackjewel Debtors and was established pursuant to the Blackjewel Debtors' plan of liquidation.  *See* DE 1-1 at 2 ¶ 1.

auction for the sale of its assets in late July and early August of 2019. *See* DE 56 at 3. INMET

Mining, LLC ("INMET"[2]) participated in the auction and, following the negotiations discussed

below, was ultimately declared the winner of the Blackjewel Debtors' Black Mountain and Lone

Mountain assets (the "Blackjewel assets"). *See id.* at 4. Defendants[3] financed INMET's

acquisition of the Blackjewel assets. *See* DE 50-1 at 2. INMET's deal with the Blackjewel Debtors

featured both an immediate lump sum payment of $6 million and annual royalty payments totaling

approximately $16.4 million over the course of six years, along with incurring or assuming other

miscellaneous expenses. *See* DE 56 at 4; DE 56-3 (Fixed Royalty Agreement); DE 56-4

(Employee Royalty Agreement); *see also* DE 1-1 at 14-17 (Sale Agreement).

On September 7, 2019, INMET and the Blackjewel Debtors executed two royalty

agreements, the Fixed Royalty Agreement (DE 56-3) and the Employee Royalty Agreement (DE

56-4) (together, the "Royalty Agreements"), both of which included a provision stating that the

obligations created by the instruments "shall run with the land." *See* DE 56-3 at 1-2 ("The Royalty

Interest, including all obligations to pay the Royalty and other obligations of Grantor, shall run

with the land and be binding upon the successors and assigns of Grantor as owners of any of the

land or real property interests with respect to the Purchased Mines . . . and shall inure to the benefit

of Grantee and its successors and assigns."); DE 56-4 at 1-2 (same). The Fixed Royalty Agreement

---

[2] In its Order Granting in part and Denying in Part Defendants' Motion to Dismiss (DE 36), the Court treated Kopper Glo Mining, LLC and INMET Mining, LLC as one entity, as the outcome did not hinge on their distinction. *See* DE 36 at 2 n.1. Consistent with that Order and given the similar insignificance of the entities' separateness here and both parties' generic use of "INMET" when referencing the subject third-party in their briefs, the Court will again refer to the relevant third party as "INMET."

[3] Defendant BMMS appears to be a subsidiary of or entity controlled by Defendant Javelin. *See* DE 1-1 at 7 ¶ 32. In Count I of its Complaint, Blackjewel seeks to hold Javelin and BMMS jointly and severally liable based on this nexus and the common management personnel. *See id.* at 10-11 ¶ 59. Defendants do not dispute this theory, at this stage, nor do they premise their grounds for summary judgment on a failure to establish a nexus between BMMS and Javelin. For this motion, the Court does not distinguish actions of the two entities.

obligated INMET to pay the Trust $2,738,092 annually for six years, with the first payment due on September 7, 2020, the first anniversary of the agreement's effective date. *See* DE 56-3 at 1-2. The Employee Royalty Agreement required INMET to pay the Trust an amount "equal to $0.25 per ton of coal mined from the Purchased Mines up to an aggregate total of $550,000" for a 24-month period, beginning upon recommencement of mining operations. *See* DE 56-4 at 1-2. Both agreements also created a reporting obligation, requiring INMET to provide Blackjewel with a recurring quarterly report "setting forth the gross production and fair market value of the operation." *See* DE 56-3 at 2; DE 56-4 at 2.

On September 17, 2019, the Bankruptcy Court entered a Sale Order approving the sale. *See* DE 1-1 at 140-78. The next day, on September 18, 2019, INMET and Defendants entered into several agreements that, together, governed the financial arrangement between the two. They entered into a Coal Marketing Agreement that appointed BMMS as the exclusive marketing agent and sales representative of INMET for a 15-year term "with respect to both domestic sales and exports of the Coal from the United States." *See* DE 56-11 at 11. They executed a Master Coal Purchase and Sale Agreement that appointed BMMS as the exclusive "offtaker and purchaser of coal from the Mine[.]" *See* DE 56-12 at 3; *see also* DE 56-13 (Amendment to the Master Coal Purchase and Sale Agreement). Finally, the parties entered into a Prepaid Purchase Agreement Confirmation that provided the prepay of $5 million to facilitate INMET's purchase of the Blackjewel assets. *See* DE 56-14. The obligations created by the foregoing agreements were secured by the assets of Industrial Minerals Group, LLC ("IMG"), INMET's parent company, which covered INMET's and Kopper Glo's assets, including the newly acquired Blackjewel assets. *See* DE 56-15, DE 56-16, DE 56-17. BMMS also secured personal guaranties from Hunter Hobson, Corbin Robertson III, and Keith Dyke, the owners of IMG. *See* DE 56-18.

3

Several times in October 2019, INMET's Hunter Hobson raised concerns to Javelin executives Peter Pritchard (a Vice President), Spencer Sloan (Chief Investment Officer), and Peter Bradley (Chief Executive Officer) about the lackluster sales forecast provided by Javelin. *See* DE 56-21; DE 56-22; DE 56-23. In a series of messages, Hobson repeatedly expressed that, based on the sales forecasts provided, they [INMET] were "very undersold" and were "carrying far too much inventory." *See* DE 56-22; DE 56-23. Later, on May 22, 2020, months after the initial concerns were raised, INMET's counsel sent Defendants a proposal revising the existing relationship that was intended to ameliorate the continued operational difficulties. *See* DE 56-26. This apparently was not well received by Sloan, who found the proposal "cold to say the least." *See* DE 56-33 at 4.

On May 23, 2020, one day after receiving INMET's email, Sloan communicated to Pritchard that he "want[ed] to put hunter into default on the prepay and call the guarantee ASAP," and he instructed Pritchard to "think through a good way to do this." *See* DE 56-27. Defendants began invoicing to INMET certain expenses, ostensibly rooted in their agreements, but including the "debateable" [sic] ones, to "inundate them" and cause a breach. *See* DE 56-31; DE 56-29. On May 29, 2020, one week after receiving INMET's email, and again on June 8, 2020, BMMS notified INMET of its default, declared the $5 million prepayment balance due, and called the personal guaranties of Hobson, Robertson III, and Dyke. *See* DE 50-4; DE 56-30. This event triggered the default interest provisions in the various agreements, compounding debt accrual and operational struggles.

Around the time of the default notice, the middle of 2020, INMET also began breaching its contracts with Blackjewel. Blackjewel alleges that, aside from the initial lump sum payment,

INMET failed to fulfill any of its Payment Obligations[4] to Blackjewel, with the first installment being due in September 2020. *See* DE 1-1 at 7 ¶¶ 33, 35. Further, Blackjewel alleges that INMET failed to fulfill its Reporting Obligations[5] under the agreements since the second quarter of 2020. *See id.* at 7 ¶ 36.

In July 2020, BMMS, Dyke, and Hobson executed a series of agreements whereby Dyke transferred his interest in INMET to Hobson in exchange for BMMS abstaining from enforcing its personal guaranty against Dyke. *See* DE 56-41. This was done, according to Blackjewel, to isolate control with Hobson, who became the sole manager of INMET through these agreements. *See* DE 56 at 10. Internal emails show that Defendants also had a plan in mid-2021 to capitalize on Robertson III's personal guaranty. Robertson III's father, Corbin Robertson, Jr., was the CEO and Chairman of Natural Resource Partners L.P. ("NRP"), from whom INMET had leased substantial property. NRP had significant leverage regarding lease rights and potential INMET default. According to the emails, Defendants plotted "running up" INMET's prepay obligation, and by extension Robertson III's obligation via his personal guaranty, to pressure Robertson Jr. to negotiate a lease deal in return for Robertson III's debt forgiveness. *See* DE 56-49.

Defendants also influenced what information INMET was permitted to communicate to third parties. *See* DE 56-8 at 114:21-116:18. Hobson testified that Defendants were involved in communications he had with his partners and with INMET's other creditors, including on royalties. *See id.* Defendants directed Hobson to negotiate royalty settlements with creditors while keeping Defendants' involvement a secret. *See, e.g.*, DE 56-40. In July of 2020, Defendants instructed Hobson to communicate to David Beckman, of Blackjewel, that INMET's financial situation was

---

[4] As defined in DE 1-1 at 6 ¶ 22.
[5] As defined in DE 1-1 at 6 ¶ 23.

grim and that bankruptcy was a looming risk.  *See* DE 56-45.  Again, in March 2022, Hobson engaged Beckman in royalty settlement negotiations during which he "painted a real desperate picture" and advised that INMET had arranged bankruptcy counsel.  *See* DE 56-54.  Hobson told Defendants that he "believe[d] [Beckman] bought it." *See id.*  Hobson referred to Beckman's unfulfilled requests for information that INMET had been "supposed" to provide under the agreements. *See id.*  Beckman wanted information to assess the negotiations and status.

Moreover, in August 2020,  after INMET's initial default but prior to the first Fixed Royalty payment due-date, INMET entered into an agreement with Javelin for the provision of consulting services in connection with a possible sale or restructuring transaction.  *See* DE 56-46. INMET was obligated to pay Javelin $1.5 million in compensation under this agreement.  *See id.* at 2.  Interestingly, that same month, Defendants internally discussed the goal of acquiring the Purchased Assets and shedding the royalty obligation.  Jerrod Freund, who originally had advised Blackjewel relative to the INMET deal but later became an insider for Defendants, stated in a text exchange:  "We need to acquire BM and LM from IM.  IM retains 3mm to bk IM and KG.  We are then free and clear from royalty . . . " *See* DE 56-44.[6]  Sloan endorsed that "structure." *See id.*

On January 26, 2023, Defendants accused Hobson of embezzling INMET funds.  *See* DE 56-55.  Hobson denied any wrongdoing.  *See* DE 56 at 14-15; DE 56-25 at 261:16-262:16. Defendants had envisioned Hobson being out, relative to the future bankruptcy:  "Hunter is clueless[.]"  *See* DE 56-44 at 3.  This accusation precipitated Hobson soon transferring his membership interest in IMG to BMMS and being removed from his position as manager and officer of IMG, thereby giving Defendants direct control over INMET.  *See* DE 56-56, DE 56-57;

---

[6] INMET also, at Defendants' request, entered into a consulting agreement with Weir Resources, LLC in June 2022 that obligated INMET to pay Weir $1 million.  *See* DE 56-47 at 1-2.

DE 56-58.  On April 5, 2023, INMET filed bankruptcy.  *See generally In re INMET Mining LLC*, No. 6:23-bk-70113-grs (Bankr. E.D. Ky. Apr. 5, 2023), DE 1 therein.  Defendants were INMET's largest secured creditors in the bankruptcy action, with INMET purportedly owing more than $100 million in secured debt.  *See* DE 56 at 16.  INMET, under the control of Defendants, filed a declaratory judgment action seeking a declaration that the "runs with the land" provision in Blackjewel's and INMET's royalty agreements was "invalid, impermissible, and unenforceable." *See Inmet Mining, LLC v. Blackjewel Liquidation Tr.*, No. 7:23-07002-grs (Bankr. E.D. Ky. May 1, 2023), DE 1 therein.  The Bankruptcy Court, addressing the Fixed Royalty, agreed and declared the provision unenforceable as a covenant that runs with the land under Kentucky or Virginia law. *See id.*, DE 69 therein.  Subsequently, at INMET's bankruptcy auction, Bluegrass Energy LLC, an entity purportedly created by Javelin, credit bid on and won the Blackjewel assets.  *See In re INMET Mining, LLC*, DE 536 therein.  The Bankruptcy Court approved the free and clear sale of the Purchased Mines.  *See id.*

On October 31, 2023, Blackjewel filed a complaint in Letcher Circuit Court, claiming tortious interference with contract, unjust enrichment, and civil conspiracy.  *See* DE 1-1 at 10-12 ¶¶ 52-76.  Defendants removed the matter to this Court, pursuant to 28 U.S.C. §§ 1332, 1441(b), 1446.  *See* DE 1 at 2 ¶ 4.  Defendants then moved to dismiss all claims asserted by Blackjewel, under Rule 12(b)(6).  *See* DE 5 (Motion to Dismiss). The Court granted in part, dismissing Blackjewel's unjust enrichment claim, but denied the motion as to the tortious interference and civil conspiracy claims.  *See* DE 36 (Order) at 14.  Defendants now move for summary judgment on the balance of claims, arguing that Blackjewel failed to meet its burden on the causation and damages elements of the tortious interference claim and that Blackjewel's derivative conspiracy claim therefore must also fail as a matter of course.  *See generally* DE 50; DE 50-1.  Blackjewel

7

responded in opposition, *see* DE 56, and Defendants replied, *see* DE 60.  The matter is now ripe for review.

## II.     Legal Standard

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* FED. R. CIV. P. 56(a)–(c).  If the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute of material fact.  *See Shreve v. Franklin Cnty.*, 743 F.3d 126, 131 (6th Cir. 2014) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986)).  The moving party bears the initial burden of showing that there is no genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2552 (1986).  If the moving party satisfies its burden, the burden shifts to the non-moving party to produce "specific facts" that suggest a "genuine issue" for trial.  *See id.* at 2553.  If the non-moving party cannot make a showing sufficient to establish the existence of an essential element of their case, then "Rule 56(c) mandates the entry of summary judgment." *Id.* at 2552.

In determining whether a genuine dispute of material fact exists, the Court construes all facts and draws all inferences in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356; *Guptill v. City of Chattanooga*, 160 F.4th 768, 776 (6th Cir. 2025).  At this stage, the Court may not "weigh the evidence [or] determine the truth of the matter" in evaluating whether there is a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).  Relatedly, the Court is not required to draw "every possible inference, no matter how stretched, in the non-movant's favor."  *See Walden v. Gen. Elect. Int'l, Inc.*, 119 F.4th 1049, 1061 (6th Cir. 2024).  The summary judgment standard requires the Court to draw in

the non-movant's favor only those inferences that are reasonable. *See id.* (citing *Kinlin v. Kline*, 749 F.3d 573, 576 (6th Cir. 2014)).

The substantive law governing the dispute dictates whether a fact is "material." *See Anderson*, 106 S. Ct. at 2510. That is, "disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* An issue is "genuine" when "there is sufficient evidence favoring the [non-moving] party for a jury to return a verdict for that party." *Id.* at 2511 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 88 S. Ct. 1575, 1592 (1968)). Such evidence must be suitable for admission into evidence at trial. *See Salt Lick Bancorp v. FDIC*, 187 F. App'x 528, 444-45 (6th Cir. 2006). The non-moving party's evidence must be "admissible only as to its contents and not as to its form, as long as the plaintiff can proffer that it will be produced in an admissible form." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 423 (6th Cir. 2021) (quoting *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997)).

Sitting in diversity jurisdiction, the Court must look to federal law to resolve procedural issues and state law to resolve substantive ones. *See Hanna v. Plumer*, 85 S. Ct. 1136, 1141 (1965); *Erie R.R. Co. v. Tompkins*, 58 S. Ct. 817, 822 (1938). A federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which it sits. *See Doe v. Etihad Airways, P.J.S.C.*, 870 F.3d 406, 435 (6th Cir. 2017). Both parties apply Kentucky substantive law in making their respective arguments. Based on the "any significant contacts" choice-of-law test employed by Kentucky courts in tort actions, which provides that any significant contact with Kentucky is sufficient to apply Kentucky law, the Court agrees that Kentucky substantive law applies. *See Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009).

9

### III.    Analysis

Defendants argue they are entitled to summary judgment on Blackjewel's remaining claims:  tortious interference with contractual relations and civil conspiracy.  The Court discusses each claim in turn.

### a.    Tortious Interference

Defendants first argue they are entitled to summary judgment on Blackjewel's tortious interference claim.  *See* DE 50-1 at 7.  Under Kentucky law, a plaintiff must prove the following elements to prevail on a claim for tortious interference with contractual relations:  (1) a contract existed between the plaintiff and a third-party; (2) the defendant had knowledge of the contract; (3) the defendant intended to cause a breach of that contract; (4) the defendant's actions in fact caused a breach of the contract; (5) the plaintiff suffered damages as a result of the breach; and (6) the defendant enjoyed no privilege or justification for its conduct.  *See Seeger Enters., Inc. v. Town & Country Bank & Tr. Co.*, 518 S.W.3d 791, 795 (Ky. Ct. App. 2017).  Kentucky, which heeds the Restatement (Second) of Torts approach to tortious interference claims, also requires the plaintiff to show improper interference by the defendant, which Kentucky courts have interpreted to mean malice or significantly wrongful conduct.  *See Nat'l Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 857 (Ky. 1988).

The Court's analysis on this claim is narrowed by Defendants' motion, which challenges Blackjewel's ability to meet its evidentiary burden only for the elements of causation and damages (elements (4) and (5)).  *See* DE 50-1 at 7.  In its Complaint, Blackjewel alleged that Defendants improperly leveraged their economic influence to prevent INMET from performing its Reporting Obligations and Payment Obligations under INMET's agreements with Blackjewel, and that

10

Blackjewel was damaged by this interference. *See* DE 1-1 at 10 ¶¶ 56, 58. Defendants contend Blackjewel cannot prove that Defendants caused INMET to breach its Payment Obligations because, for economic reasons, "INMET could not have made these payments in any event." *See* DE 50-1 at 7. Further, Defendants argue that discovery has not yielded any admissible proof that Defendants caused INMET to breach its Reporting Obligations. *See id.* Therefore, Defendants argue that, as a matter of law, Blackjewel cannot meet its burden of presenting evidence on which the jury could reasonably find that Defendants caused INMET to breach its Reporting Obligations. *See id.* Lastly, Defendants argue that Blackjewel has not shown that Defendants caused Blackjewel to incur any recoverable damages. *See id.* at 12.

### 1) Causation

The Court first addresses causation. Defendants assert that Blackjewel cannot establish proximate cause, as a tort element, for INMET's breach of its Payment Obligations or its Reporting Obligations. In Kentucky, tortious interference with contractual relations—an intentional tort—requires proof of proximate cause, which means that "the act must be 'a substantial factor in bringing about the harm.'" *See Ventas, Inc. v. Health Care Prop. Invs., Inc.*, 635 F. Supp. 2d 612, 624 (W.D. Ky. 2009) (quoting *Bailey v. N. Am. Refractories Co.*, 95 S.W.3d 868, 871 (Ky. Ct. App. 2001)); *Nursing CE Cent. LLC v. Colibri Healthcare, LLC*, No. 5:23-CV-232-DCR, 2024 WL 329523, at *4 (E.D. Ky. Jan. 29, 2024). Under Kentucky law, which tracks the Restatement approach, whether a defendant's conduct caused a third party to breach his contract with the plaintiff typically raises an issue of fact. *See* Restatement (Second) of Torts § 766 cmt. o (AM. L. INST. 1979); *see also Church Mut. Ins. Co. v. Smith*, No. 3:14-CV-749-JHM, 2017 WL 5987691, at *4 (W.D. Ky. Dec. 1, 2017) (denying a motion for summary judgment on a tortious interference with a contractual relationship claim because questions of fact relating to causation had to be

11

decided by a jury). However, that typicality assumes sufficient proof, along with reasonable inferences, to establish that the cause question is subject to fair debate and is not so one-sided as to yield only one result. As the Sixth Circuit has observed, in *Thacker v. Ethicon, Inc.*, 47 F.4th 451, 460 (6th Cir. 2022): "Kentucky uses the substantial factor test for proximate causation . . . Because this inquiry involves thorny factual questions, Kentucky courts ordinarily leave questions of proximate causation to a jury." *See also McCoy v. Carter*, 323 S.W.2d 210, 215 (Ky. 1959) (leaving proximate cause question to jury when "cause is open to reasonable difference of opinion").

### (i)    Payment Obligations

Defendants contend the evidence shows that Defendants were not the but-for cause of INMET's breach of its Payment Obligations. *See* DE 50-1 at 10-11. Instead, Defendants argue the true reason for INMET's breach, independent of any act of Defendants, was INMET's precarious financial situation precipitated by the outbreak of COVID-19 and corresponding mine shutdowns. *See id.* at 11. Defendants highlight Hobson's deposition testimony that INMET would have had to borrow from Javelin to fulfill its Payment Obligations. *See* DE 50-2 at 14. Defendants argue that this dependence on Javelin, and Hobson's testimony that INMET lacked the funds to pay, allow the Court to bypass the Restatement approach discouraging grants of summary judgment on causation, because that general principle only applies when there are genuine disputes of material fact. *See* DE 60 at 8 (citing *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 92 (Ky. 2003)).

The Court is unpersuaded and finds triable issues. The lightly supported COVID theory and overall financial health excuse are too reductive and binary, on this record and under the proper Rule 56 rubric.

This conclusion involves consideration of Defendants' multifarious contractual relationships with INMET.  Along with a primary role as creditor of INMET, Defendants acquired, through agreements allegedly proposed on a "take-it or leave-it" basis, *see* DE 56-8 at 86:8-18, certain rights directly influencing INMET's financial performance and, resultingly, INMET's ability to make its payments to other creditors, including Blackjewel.  The Coal Marketing Agreement appointed Defendants as INMET's "exclusive marketing agent and sales representative" and prohibited INMET from entering into direct sales arrangements for coal with customers, other than certain pre-approved arrangements.  *See* DE 56-11 at 11.  The Master Coal Purchase and Sale Agreement appointed Defendants as INMET's "exclusive offtaker and purchaser of coal from the Mines[.]"  *See* DE 56-12 at 3.  These agreements (deemed outside market norms by Blackjewel's expert) allowed Defendants to collect a significant fee on every sale of INMET's coal, irrespective of price—even those occurring at a loss for INMET.  *See* DE 56-20 at 40:18.  The prepay financing facility introduced significant interest obligations relative to INMET's draws.

Viewing these agreements together, Defendants clearly possessed and exerted significant influence over INMET's financial performance, cash flow, and ability to fulfill its obligations with various creditors, including Blackjewel.  To summarize the agreements:  INMET was not allowed to market its coal to the public; only Defendants could do this.  INMET was not, for the most part, permitted to enter into sales agreements; only Defendants could do this on INMET's behalf.  INMET could not sell its coal freely.  Defendants therefore dictated when, to whom, and on what terms INMET could sell its product.  The prepaid agreement, as a financing vehicle, triggered significant interest (default and otherwise) and fee load, one that predominated by the time the INMET bankruptcy ripened.  *See* DE 56-35.  A reasonable juror could certainly find that this

13

financial arrangement as it functioned, in the context of the overall course of resultant facts, to include the conduct and statements of Defendants' agents, was a substantial factor in bringing about INMET's breach of its Payment Obligations. *See Ventas, Inc.*, 635 F. Supp. 2d at 624.

As with most cases, the story has two sides. Defendants, repeatedly invoking financial logic, ask why they would act in the way depicted—they could simply have bought the assets at the outset and avoided the lost investments required, over the period, to eventually land the Purchased Mines. They also cite objective market forces and the historical COVID event as demonstrating that they efforted to be INMET saviors, not the raiders Blackjewel describes. That might be what the jury believes. However, many counterpoints or counter inferences surface from the record.

Hobson, even pre-COVID, viewed INMET as strangled by the deal and nearly certain to fold absent a change in the parties' relationship and performance. *See* DE 56-21 to -23 (including fall 2019 observation that, on current forecasts from Javelin, "we are f***ed, and don't have enough sales to run these operations much past January/February"). Hobson testified that in early 2020, his concern was "that the fee structure is such that we'll never dig ourselves out of this hole if they don't change." DE 56-8 at 113:12-21; *id.* at 114:10-19 ("I had no way to earn my way out of the situation where we continued to incur debt because of fee structure."). Although INMET struggled and lapsed into default in mid-2020, Defendants continued to make money on the deal through accrual of interest and fees. *See id.* at 85-88. The combination of sales control, holdbacks from the prepaid relationship, and imposition of murky fees (like demurrage) heightened the pressure on INMET, pressure Defendants continued to ratchet. *See id.* at 112 (discussing agency and other fees as "exorbitant" and charged with "no transparency to them"). Indeed, Defendants' plan, responding to INMET's keening, was to put Hobson "into default on the prepay and call" his

14

personal guaranty. *See* DE 56-27. This, under Sloan's direction, called for Defendants to "inundate" INMET with invoices, even ones Defendants internally called debatable. *See* DE 56-31 (Sloan: "pls invoice those as well. Even if it's debateable [sic], just do it. I want to inundate them[.]"); *id.* ("I want to inundate them with invoices.").

The counter-logic, supported by the record, is thus: Defendants plainly viewed bankruptcy by INMET as in the mix, really from the very start of the company. *See* DE 56-8 at 68 (Sloan agreeing that Defendants were doing bankruptcy contingency planning with respect to INMET, including with respect to royalties, in August 2019); DE 56-24 (Pritchard ruminating on "when they go bust in the first 6 months"). Defendants resisted, even from the time of the Blackjewel bankruptcy, the existence and validity of the "runs with the land" royalty concept. *See* DE 56-7 at 66-67 (Sloan discussing posture on royalties). By August 2020, Defendants had a *stated* goal of acquiring the Purchased Mines free and clear after a bankruptcy by INMET. *See* DE 56-44 at 97436 (discussion between Sloan and the side-swapping Freund, in August 2020, regarding INMET, royalties, and bankruptcy: "We need to acquire BM and LM from IM. IM retains 3mm to bk IM and KG. We are them [sic] free and clear from royalty[.]"). Through the relationship and period, Defendants exerted significant control over INMET's cash flow and decisions on whom to pay. Hobson noted that he had to discuss "every dollar we were going to spend" and get permission from Javelin. *See* DE 56-25 at 259-60. Defendants were making money on the deal aspects, *see* DE 56-20 at 37-41 (Pritchard, referencing interest and fees), and Defendants believed the entire relationship would cover their investment. *See* DE 56-24 at 6 (Bradley observing bankruptcy risk and predicting: "We are well positioned. I will earn enough money out of bjms to cover the episode.").

Other points inferentially confirm the causal version Blackjewel portrays. Blackjewel depicts the steps needed to center control in Hobson (by removing other IMG members) and then to eliminate the "clueless" Hobson, *see* DE 56-44, for purposes of the envisioned bankruptcy. The series of guaranty-enforcement steps, *see*, *e.g.*, DE 56-37 to -40, and the embezzlement allegations against Hobson match Blackjewel's themes. Plainly, Hobson saw the contested allegations as an effort to take INMET from him. *See* DE 56-25 at 262:10-16. Whatever Hobson did or did not do in terms of access to or personal use of INMET funds, the fact that Defendants hired Hobson for $500K, *after* discovering alleged embezzlement, casts the episode into much doubt. *See* DE 56-59.

And lastly, fees and information: Hobson indicates significant questions regarding interest charges and fees, such as for demurrage, imposed by Defendants on INMET. *See, e.g.*, DE 56-25 at 153-55 (discussing claimed totals owed by INMET--$100 million--were "asinine" and as never adequately explained or documented). As to demurrage, even representatives of Defendants showed sharp reason for doubt. In November 2021, as Hobson complained about "$3 million worth of holdbacks they have on us for demurrage" and lack of transparency or underlying merit, Freund responded by calling the demurrage "insane," "craY," and "bullshit." *See* DE 56-34. If dubitable, piling fees and holdbacks led to restricted cash flow, which led to line draws and yet more accumulating interest, there is an obvious relationship to INMET's ability to pay third-party debt, the royalties included. Perhaps the dynamics of INMET's operations under the contracts, in the market at the time and accounting for COVID, legitimately created this cycle. However, Sloan himself called in mid-2020 for inundation of INMET with debatable invoices. This also echoes the pressure campaign used with respect to Corbin Robertson III and his personal guaranty, where Sloan postured in a way that would expose Robertson III to a greater guaranty and thus act as a

16

solvent on related negotiations with Robertson's father in the NRP lease dispute. Sloan's stated plan: "1) Run up the prepay [at the time described as "15-20 mm and . . . interest of L + 24%"] 2) Take Corby to court. . . 3) Negotiate lease in return for some Corby debt forgiveness." *See* DE 56-49. This view toward claimed salient obligations—that debatable invoices would apply and/or that a stated debt under the documents, including the prepay facility, would be "run up" for leverage—casts a shadow over the legitimacy of the financial elements. A jury could view such posturing as indicative of Defendants literally creating leverage and thus pretextually crimping INMET's cash flow. One potential causal victim? The royalty payees.

Defendants attempt to defend with Hobson's testimony that he "didn't believe [Defendants] did anything that wasn't provided for in the documents." *See* DE 50-2 at 373:11-18. Of course, contractual remedial elections, if founded on a doubtful empirical record, would still be subject to scrutiny by a jury. Further, that Defendants' conduct was arguably provided for in its agreements does not immutably shield it from tort liability. The exercise of contractual rights can give rise to an actionable tortious interference claim when done for an improper purpose. *See, e.g.*, *Raheel Foods, LLC v. Yum! Brands, Inc.*, No. 3:16-CV-00451-GNS, 2017 WL 217751, at *5 (W.D. Ky. Jan. 18, 2017) ("Plaintiffs do not allege that Defendants' mere denial of Non-Party Raheel Foods proposed sales was improper interference. The problem, as alleged by Plaintiffs, is that Defendants used their disapproval rights for an improper purpose—to take Plaintiffs' buyers for themselves. These allegations distinguish the present circumstances from *Hornung* and *Blair*. *The fact that Defendants had the right to deny the sales proposed by Non-Party Raheel Foods is not fatal to Plaintiffs' claims*.") (emphasis added).

The Court notes a few final evidentiary pieces. Hobson explicitly testified that Defendants encouraged him not to pay the Blackjewel royalty. *See* DE 56-25 at 418:16-419:2. Blackjewel

adduces the intervening consulting agreements as further causal evidence of interference. The first agreement was with Javelin, to whom INMET was already severely indebted, for a sum of $1.5 million. *See* DE 56-46. The second was with Weir Resources for $1 million, but this was entered into at the request of Defendants. *See* DE 56-47. With respect to a strapped firm, these agreements, initiated by Javelin, arguably had an appreciable impact on INMET's ability to meet any of the royalty duties.

Defendants reductively cast the causal issue as binary—whether a jury could find that Defendants did or did not cause the royalty nonpayment. The issue is more nuanced. INMET paid *none* of the Royalty Obligations. Although the fixed royalty gets the most attention, the employee royalty (capped at $550,000 and payable over the first 24 months of mining) also went completely unmet. A jury could accept that INMET was never in a position to pay its entire debt to Blackjewel but also could accept that Defendants intentionally thwarted INMET from paying any part of the royalties from a finite pot. Defendants plainly had the intent to greatly reduce or extinguish the royalty claims, in one way or another. *See* DE 56-40; DE 56-45; DE 56-44. In the Court's view, under the required pro-plaintiff prism, the evidence regarding Defendants' granular financial control, its enduring anti-royalty posture, and its expressed acquisition designs from INMET's infancy all further contribute to a triable issue on the causal question.

### (ii)    Reporting Obligations

Defendants assert that Blackjewel has no admissible evidence showing Defendants were the proximate cause of INMET breaching its Reporting Obligations. *See* DE 50-1 at 8. They argue that the only evidence propounded by Blackjewel for proving causation is David Beckman's deposition testimony where, in reference to INMET's failure to provide the required reporting, Beckman testified, "And I kept saying to him – and at one point [Hobson] got fairly frustrated and

18

just said, They won't let me." *See* DE 50-13 at 144:9. Defendants argue this is inadmissible hearsay testimony that cannot be considered at summary judgment. *See* DE 50-1 at 8. Blackjewel counters that this statement qualifies as a hearsay exception under Rule 804(b)(3)(A), as a statement against interest.

A court may not consider inadmissible evidence when ruling on a motion for summary judgment. *See Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (citing *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997)). Hearsay, an out-of-court statement offered for the truth of the matter asserted, is inadmissible, per Rule 802, unless it fits into one of the established exceptions to the hearsay ban. *See* FED. R. EVID. 801(c); *Insight Terminal Sols., LLC v. Cecelia Fin. Mgmt.*, 148 F.4th 869, 877 (6th Cir. 2025). Federal Rule of Evidence 804 provides a list of hearsay exceptions applicable when the declarant is "unavailable" as defined in Rule 804(a). FED. R. EVID. 804(a). Blackjewel contends that Hobson is unavailable under Rule 804(a)(3), which considers a declarant unavailable if the declarant "testifies to not remembering the subject matter." FED. R. EVID. 804(a)(3). Blackjewel argues Hobson is unavailable with respect to the hearsay at issue, because Hobson testified, "I don't recall specifically saying Javelin would not allow me to give that information." *See* DE 56-25 at 412:18.

The Sixth Circuit has not firmly established the requisite level of forgetfulness necessary to qualify under Rule 804(a)(3).[7] Other circuits, however, have interpreted the provision to mean that the declarant "has no memory of the events to which his hearsay statements relate." *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1317 (11th Cir. 2013) (quoting *N. Miss.*

---

[7] *See United States v. King*, No. 92-2278, 1993 WL 346861, at *2 (6th Cir. Sep. 10, 1993) (holding declarant was not unavailable under 804(a)(3) simply because he could not remember one question); *United States v. Rodgers*, No. 93-5134, 1993 WL 330642, at *3 (6th Cir. Aug. 30, 1993) (holding declarant was unavailable under Rule 804(a)(3) based on testimony that "he did not 'remember everything that happened that night'").

*Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1336 (5th Cir. 1986)).  "The fact that the witness does not remember making the statements themselves is irrelevant."  *Id.*  Following this approach and the determination suggested in *King*, Hobson is not, as to the statement, an unavailable witness. While Hobson may not recall specifically saying the exact phrase Beckman claims he said, he remembers the events to which the hearsay statement relates—INMET's failure to provide the required reporting information—as amply demonstrated by the totality of his deposition testimony. Therefore, because Hobson is not "unavailable," Beckman's deposition testimony is inadmissible hearsay and cannot be considered substantively.[8]

Blackjewel argues, though, that even without consideration of Beckman's testimony, there is sufficient circumstantial evidence from which a reasonable jury could find that Defendants caused INMET to breach its Reporting Obligations.  *See* DE 56 at 21.  As the argument goes, given Defendants' control over INMET's communications with third parties, a reasonable juror could infer that Defendants caused the Reporting Obligations breach.  The Court agrees.

The deposition testimony of Hobson fairly indicates that Defendants wielded significant authority over the information INMET was permitted to provide third parties, Blackjewel included. *See* DE 56-8 at 115:2-116:18.  Email and text exchanges cited by Blackjewel corroborate Hobson's testimony.  *See* DE 56-40 (Sloan instructing Hobson to "focus on…getting a deal done with a Riverstone and Debtors.  Lets get an agreement to settle 100% of the total royalty for $1.5 mm but you need 9 months to raise the equity to restart INMET.  Also, *nobody can know we are involved*.") (emphasis added); DE 56-45 (Sloan and Freund providing input on how Hobson should reply to a failed settlement negotiation); DE 56-52 (Sloan stating "I spoke to Jerrod. He agrees you need to

---

[8] The Court also would reject Rule 804(b)(3)(A) as an exception vehicle.  Blaming Defendants hardly qualifies as an adequate statement against interest.

get in front of David Beckman and tell him you lost leases and paint dire picture."). The truth is that INMET never met the Reporting Obligations. During the entire period, Defendants were anti-royalty and repeatedly approached the topic with spoken or unspoken threats of bankruptcy and risks toward the royalties. This begat negotiations that stressed to INMET that it should describe itself to royalty payees in bleak or dire terms. Defendants' secretiveness and information control extended to many interactions, such as with negotiations regarding royalties and other negotiations regarding guaranties. *See, e.g.*, DE 56-39; 56-40; 56-54 (saying, in March 2022, that Blackjewel "bought" Hobson's "real desperate picture" but was demanding "reporting statistics that we have supposed to been providing to him per the original agreement"). Defendants likewise were opaque toward INMET itself, not responding to requests for fee/charge explanation. *See, e.g.*, DE 56-25 at 152:21-156:9; DE 56-33 (complaining about lack of and demanding information needed for reconciliation of expenses charged). Considering the level of control and authority these exchanges evince, a rational juror could infer that Defendants dictated, and curtailed the contractual compliance of, INMET's reporting to Blackjewel.

It is true that Hobson testified to not specifically recalling saying Defendants forbade him from providing the required reporting, as Beckman claimed. *See* DE 56-25 at 412:18-19. However, later in that deposition, Hobson testified that it was possible that he did tell Beckman he was prevented from providing the required reporting by Defendants ("I could have."); he just could not recall "with a hundred percent accuracy." *See id.* at 423:1-24. Importantly, he also testified that Javelin asked him not to reveal certain other information to Beckman. *See id.* at 418:6-15. Defendants do not address Blackjewel's circumstantial evidence argument; their entire argument is that Beckman's earlier testimony is hearsay and that there is "not a shred of additional evidence." *See* DE 50-1 at 9. Not so.

Simply put, as to the Reporting Obligations breach, Blackjewel has propounded sufficient evidence to put a material fact in genuine dispute and thus survive summary judgment.

Accordingly, the Court finds there are outstanding factual disputes regarding whether Defendants' conduct was the proximate cause of INMET's breach of its Payment Obligations and Reporting Obligations.

### 2) Damages

The Court now addresses the damages element.  Within the tort, Kentucky law requires the plaintiff to show damages as a result of the breach of the subject contract.  *See Seeger Enters., Inc.*, 518 S.W.3d at 795.  Furthermore, the plaintiff must prove such damages with reasonable certainty. *See Musselman Bros v. Dial-Huff & Assocs., Inc.*, 826 S.W.2d 838, 840 (Ky. Ct. App. 1992). Defendants offer two arguments as grounds for summary judgment on the issue of damages.  The first rehashes the causation theory, which the Court has already rejected as a basis for judgment.

Second, Defendants argue that, due to a faulty valuation method used by Blackjewel's expert, which they have separately moved to exclude, Blackjewel has failed to demonstrate damages with reasonable certainty, the guiding standard.  *See id.* at 12-13.  Although the Court largely agrees on the expert as elsewhere addressed, even without the expert, Blackjewel can establish the raw obligations, which *all* went fully unpaid.  *See* DE 56 at 25.  Summary judgment is not proper as to Blackjewel's ability to prove damages.  The topic will be for the jury to resolve.

### b.  Civil Conspiracy

Defendants also move for summary judgment on Blackjewel's civil conspiracy claim.  *See* DE 50-1 at 13.  Its ground for such request is simple:  civil conspiracy is not an independent claim, but rather a theory by which a plaintiff may recover from multiple defendants for a single tort, and

22

because Blackjewel cannot withstand summary judgment on its tortious interference claim, its civil conspiracy claim must fail for lack of an anchoring claim. *See id.* (citing *Christian Cnty. Clerk ex rel. Kem v. Mortg. Elec. Registration Sys., Inc.*, 515 F. App'x 451, 458 (6th Cir. 2013) (quoting *Stonestreet Farm, LLC v. Buckram Oak Holdings, N.V.*, Nos. 2008-CA-002389-MR, 2009-CA-00026-MR, 2010 WL 2696278, at \*13 (Ky. Ct. App. July 9, 2010)))). Because the Court denies summary judgment, it must also deny the parallel motion as to the civil conspiracy claim.

## IV. Conclusion

Accordingly, the Court **DENIES** DE 50 on the stated terms.

This the 31st day of March, 2026.

Signed By:

*Robert E. Wier*

**United States District Judge**